UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW HAMPSHIRE

Brian Shaw

    v.

Andrew Saul[1], Commissioner,
U.S. Social Security
Administration

Civil No. 19-cv-730-LM
Opinion No. 2020 DNH 100

### O R D E R

Pursuant to 42 U.S.C. § 405(g), Brian Shaw seeks judicial review of the decision of the Commissioner of the Social Security Administration denying his applications for disability insurance benefits and for supplemental security income. Shaw moves to reverse the Commissioner's decision, contending that the Administrative Law Judge ("ALJ") erred by assigning improper weight to the medical opinions in the record. The Administration moves to affirm. For the reasons discussed below, the decision of the Commissioner is affirmed.

#### STANDARD OF REVIEW

In reviewing the final decision of the Commissioner under Section 405(g), the court "is limited to determining whether the ALJ deployed the proper legal standards and found facts upon the

---

[1] On June 17, 2019, Andrew Saul was sworn in as Commissioner of Social Security. Pursuant to Fed. R. Civ. P. 25(d), he automatically replaces the nominal defendant, Nancy A. Berryhill, who had been Acting Commissioner of Social Security.

proper quantum of evidence." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999); accord Seavey v. Barnhart, 276 F.3d 1, 9 (1st Cir. 2001).  The court defers to the ALJ's factual findings as long as they are supported by substantial evidence.  42 U.S.C. § 405(g); see also Fischer v. Colvin, 831 F.3d 31, 34 (1st Cir. 2016).  "Substantial-evidence review is more deferential than it might sound to the lay ear: though certainly 'more than a scintilla' of evidence is required to meet the benchmark, a preponderance of evidence is not." Purdy v. Berryhill, 887 F.3d 7, 13 (1st Cir. 2018) (citation omitted).  Rather, the court "must uphold the Commissioner's findings if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support her conclusion." Id. (citation, internal modifications omitted).

## DISABILITY ANALYSIS FRAMEWORK

To establish disability for purposes of the Social Security Act (the "Act"), a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  The Commissioner has established a five-step sequential process for determining whether a claimant has made the requisite demonstration.  20

C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); see also Bowen v. Yuckert, 482 U.S. 137, 140 (1987).  The claimant "has the burden of production and proof at the first four steps of the process." Freeman v. Barnhart, 274 F.3d 606, 608 (1st Cir. 2001).  The first three steps are: (1) determining whether the claimant is engaged in substantial gainful activity; (2) determining whether he has a severe impairment; and (3) determining whether the impairment meets or equals a listed impairment. 20 C.F.R. §§ 404.1520c(a)(4)(i)-(iii), 416.920(a)(4)(i)-(iii).

If the claimant meets his burden at the first two steps of the sequential analysis, but not at the third, an ALJ assesses the claimant's residual functional capacity ("RFC"), which is a determination of the most a person can do in a work setting despite the limitations caused by his impairments. Id. §§ 404.1520(e), 416.920(e), 404.1545(a)(1), 416.945(a)(1); see also S.S.R. No. 96-8p, 1996 WL 374184 (S.S.A. July 2, 1996).  At the fourth step of the sequential analysis, the ALJ considers the claimant's RFC in light of his past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).  If the claimant can perform his past relevant work, the ALJ will find that the claimant is not disabled.  See id.  If the claimant cannot perform his past relevant work, the ALJ proceeds to the fifth step, at which it is the Administration's burden to show that

3

jobs exist in the economy which the claimant can do in light of his RFC.  See id. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## BACKGROUND

A detailed recital of the factual background can be found in Shaw's statement of facts (doc. no. 8) as supplemented by the Commissioner's statement of facts (doc. no. 10), and in the transcript of the administrative record (doc. no. 6).  The court provides a brief summary of the case here and provides further summary of Shaw's medical history below, in connection with its discussion of the issues raised by the parties.

Shaw filed an application for disability insurance benefits and an application for supplemental security income on March 20, 2018, alleging a disability onset date of November 6, 2017.[2] Shaw alleged that he was disabled due to seizures, muscle weakness and loss of mobility in his left arm, chronic nerve

---

[2] Shaw's Statement of Material Facts contains a reference to Shaw's "amended alleged disability onset date of December 31, 2014."  Doc. no. 8, ¶ 1.  This reference appears to have been included in error.  There is no other suggestion elsewhere in the record that Shaw ever amended his alleged disability onset date. Moreover, the medical record makes clear that Shaw's allegedly disabling conditions were not present as of December 31, 2014, but rather arose in November 2017, nearly three years later.  See Admin. Rec. at 278-379, 381-400.  In addition, it is clear from the record that Shaw worked full time from 2014 through approximately November 2016, nearly two years after the referenced date.  See id. at 47-48, 197-209.  Finally, neither Shaw's complaint nor the memorandum in support of Shaw's motion suggests that Shaw was disabled prior to November 6, 2017.  See doc nos. 1, 7.  The court therefore disregards the reference.

pain, severe headaches, and posterior reversible encephalopathy syndrome ("PRES").  Shaw met the insured status requirements of the Act through December 31, 2017.

After the Administration denied Shaw's application, Shaw requested a hearing before an ALJ.  The ALJ held a hearing on February 13, 2019.  Shaw testified at the hearing, as did impartial vocational expert Elizabeth C. Laflamme.

The ALJ issued an unfavorable decision on February 26, 2019.  She found that Shaw had a combination of severe impairments consisting of status post PRES, degenerative disc disease of the cervical spine with left C5-6 radiculopathy, left carpal tunnel syndrome, post-traumatic stress disorder ("PTSD"), and mild neurocognitive disorder.[3]  The ALJ did not find that Shaw's combination of impairments met or equaled the severity of the impairments listed at 20 C.F.R. § 404, Subpart P, Appendix 1.

The ALJ found that Shaw had the residual functional capacity to perform light work as defined at 20 C.F.R. §§ 404.1567(b) and 416.967(b), with the following physical limitations:

> [Shaw] can lift and carry 20 pounds occasionally but
> he cannot lift more than 10 pounds with the upper

---

[3] The ALJ did not find that Shaw was severely impaired in connection with his other diagnosed conditions, namely hypertension, high cholesterol, and possible postural orthostatic tachycardia syndrome.

extremity alone; he can frequently lift up to 10
pounds; he can sit for 6 hours in an 8-hour workday;
[he can] stand and walk for 4 hours in an 8-hour
workday; he cannot climb ladders, ropes, or scaffolds;
he can occasionally climb ramps and stairs; he cannot
crawl; he can occasionally balance, stoop, kneel, and
crouch; he cannot perform overhead reaching with the
dominant, left upper extremity; he is limited to
frequent fingering and handline with his dominant,
left upper extremity; he should not be exposed to
vibrations (i.e., handheld power tools); and he should
not be exposed to hazards (i.e., unprotected heights
and dangerous moving machinery).

Admin. Rec. at 15.  The ALJ assessed Shaw's mental limitations

as follows:

[Shaw] is able to understand, remember, and carry out
uncomplicated tasks (i.e., tasks typically learned in
less than 30 days); instructions must be given orally
and/or in writing; and he can maintain concentration,
persistence, and pace for two-hour blocks of time
throughout the workday, consistent with regularly
scheduled breaks/lunch.

Id.

In assessing Shaw's RFC, the ALJ found that Shaw's

testimony regarding the intensity, persistence, and limiting

effects of his symptoms was not fully consistent with the

available medical evidence.  The ALJ considered all of the

medical evidence of record, including the opinions of reviewing

consultative physician Stephanie Green, M.D., examining

neurologist Samhitha Rai, M.D., treating physician's assistant

Marcy Starling, PA-C, reviewing consultative psychiatrist

Stephen Kleinman, M.D., examining consultative psychologist

Stefanie Griffin, Ph.D., and treating social worker Rachael

6

Wizwer.  In connection with her assessment of Shaw's physical
RFC, the ALJ found the opinion of reviewing consultative
physician Dr. Green to be persuasive, well-supported, and
consistent with the medical evidence of record, but found the
opinions of examining neurologist Dr. Rai and treating
physician's assistant Starling to be less persuasive on both
supportability and consistency grounds.  In connection with her
assessment of Shaw's mental RFC, the ALJ similarly found the
opinion of reviewing consultative psychiatrist Dr. Kleinman to
be persuasive, well-supported, and consistent with the medical
evidence of record, but found the opinions of examining
consultative psychologist Dr. Griffin and treating social worker
Wizwer to be less persuasive on both supportability and
consistency grounds.

In response to hypothetical questions posed by the ALJ,
Laflamme, the impartial vocational expert, testified to her
opinion that a person with Shaw's age, education, past work
experience, and RFC could perform the job duties of occupations
existing in significant numbers in the national economy,
including as representative examples laundry classifier, price
marker, and school bus monitor.  Based on this testimony, the
ALJ found at Step Five of the sequential process that Shaw was
not disabled for purposes of the Social Security Act, and had
not been under a disability from November 6, 2017 (his alleged

disability onset date) through February 26, 2019 (the date the
ALJ's decision issued).

On June 24, 2019, the Appeals Council denied Shaw's request
for review. In consequence, the ALJ's decision became the
Administration's final order for purposes of judicial review.
20 C.F.R. § 422.210(a); see also, e.g., Sims v. Apfel, 530 U.S.
103, 107 (2000). This action followed.

## DISCUSSION

On appeal, Shaw argues that the ALJ erred in weighing the
medical opinions of record. Specifically, Shaw argues that the
ALJ erred in her assessment of his physical RFC when she found
the opinion of reviewing consultative physician Dr. Green more
persuasive than the contrary opinions of examining neurologist
Dr. Rai and treating physician's assistant Starling. Shaw
further argues that the ALJ erred in her assessment of his
mental RFC when she found the opinion of reviewing consultative
psychiatrist Dr. Kleinman more persuasive than the contrary
opinions of examining consultative psychologist Dr. Griffin and
treating social worker Wizwer.

> For applications like this one, filed on or after
> March 27, 2017, the [Administration] has fundamentally
> changed how adjudicators assess opinion evidence. The
> familiar and longstanding requirements—that
> adjudicators must assign "controlling weight" to a
> well-supported treating source's medical opinion that
> is consistent with other evidence, and, if controlling

weight is not given, must state the specific weight
that is assigned—are gone.

Nicole C. v. Saul, Case No. CV 19-127JJM, 2020 WL 57727, at *4
(D.R.I. Jan. 6, 2020) (citing 20 C.F.R. § 404.1520c(a)).  Under
the newly applicable regulations, which (as noted) govern
applications filed on or after March 27, 2017, an ALJ does not
assign specific evidentiary weight to any medical opinion and
does not defer to the opinion of any medical source (including
the claimant's treating providers).  20 C.F.R. §§ 404.1520c(a),
416.920c(a).  Instead, the ALJ evaluates the relative
persuasiveness of the medical evidence in terms of five
specified factors.  Id.

The five factors the ALJ considers in evaluating the
persuasiveness of a medical opinion are supportability (the
relevance of the opinion's cited objective medical evidence),
consistency (how consistent the opinion is with all of the
evidence from medical and non-medical sources),
treatment/examining relationship (including length of treatment
relationship, frequency of examinations, purpose of treatment
relationship, and existence and extent of treatment/examining
relationship), specialization (the relevance of the source's
specialized education or training to the claimant's condition),
and what the Administration refers to as "other factors" (the
medical source's familiarity with the claimant's medical record

as a whole and/or with the Administration's policies or evidentiary requirements).  Id. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5) (emphasis supplied).  Of the five factors, the "most important" are supportability and consistency.  Id. §§ 404.1520c(a), 404.1520c(b)(2), 416.920c(a), 416.920c(b)(2).

Although the ALJ must consider all five of the factors in evaluating the persuasiveness of medical evidence, when preparing the written decision the ALJ is, in most cases, only required to discuss application of the supportability and consistency factors.  Id. §§ 404.1520c(b)(2), 416.920c(b)(2). Only where contrary medical opinions are equally persuasive in terms of both supportability and consistency is the ALJ required to discuss their relative persuasiveness in terms of the treatment/examining relationship, specialization, and other factors.  Id. §§ 404.1520c(b)(3), 416.920c(b)(3).  In addition, where a single medical source offers multiple opinions, the ALJ is not required to discuss each opinion individually, but instead may address all of the source's opinions "together in a single analysis."  Id. §§ 404.1520c(b)(1), 416.920c(b)(1).

Moreover, while the ALJ must consider all of the relevant evidence in the record, id. §§ 404.1520b(a)-(b), 416.920b(a)-(b), the ALJ need not discuss evidence from nonmedical sources, including, e.g., the claimant, the claimant's friends and family, educational personnel, and social welfare agency

personnel.  Id. §§ 404.1502(e), 404.1520c(d), 416.902(j),
416.920c(d).  And while the regulations require the ALJ to
discuss the relative persuasiveness of all medical source
evidence, id. §§ 404.1520c(b), 416.920c(b), the claimant's
impairments must be established specifically by evidence from an
acceptable medical source, id. §§ 404.1521, 416.921.
"Acceptable medical sources" are limited to physicians and
psychologists, and (within their areas of specialization or
practice) to optometrists, podiatrists, audiologists, advanced
practice registered nurses, physician assistants, and speech
pathologists.  Id. §§ 404.1502(a), 416.902(a).  Evidence from
other medical sources, such as licensed social workers or
chiropractors, is insufficient to establish the existence or
severity of a claimant's impairments.  Id.

Finally, the ALJ need not discuss evidence that is
"inherently neither valuable nor persuasive," including
decisions by other governmental agencies or nongovernmental
entities, findings made by state disability examiners at any
previous level of adjudication, and statements by medical
sources as to any issue reserved to the Commissioner.  Id. §§
404.1520b(c), 416.920b(c).

I.   <u>Shaw's Medical History</u>

Shaw worked full time from 1991 through 2001, did not work (or reported minimal earnings) from 2002 through 2007, worked for part of 2008, and did not work (or reported minimal earnings) from 2009 through 2013.  Admin. Rec. at 197-209.  He worked full time from 2014 through approximately November 2016, at which time he stopped working after suffering a knee injury unrelated to his current impairments.  <u>Id.</u> at 47-48.  After he recovered from his knee injury, he was unable to find work through his alleged disability onset date of November 6, 2017. <u>Id.</u>

Shaw attended physical therapy in connection with his knee injury in January 2017.  <u>Id.</u> at 727-745.  At the conclusion of that therapy, as of approximately January 26, 2017, Shaw and his physicians determined that he was "ready to return to work." <u>Id.</u> at 743.  As noted, he nevertheless did not return to work thereafter.

Shaw again sought physical therapy in March 2017 (prior to his alleged disability onset date of November 6, 2017), complaining of pain and weakness in his left arm and shoulder. <u>Id.</u> at 746-756.  Shaw told his physical therapists that these symptoms had begun 18 months previously.  <u>Id.</u> at 752.  Shaw thereafter attended physical therapy sessions on approximately a weekly basis, and his therapists recorded steady improvement in

his weakness, pain, and range of motion over the following months.  Id. at 746-809.  In June 2017, Shaw reported relief from his symptoms, and his therapists recorded that his therapy was complete, all recovery goals having been accomplished.  Id. at 805-809.

On November 6, 2017, Shaw reported to a hospital emergency room reporting a severe headache, a mild persistent fever, and recent rapid weight loss.  Id. at 307.  He received a CT scan of the head which revealed no abnormalities and was sent home with pain medications.  Id. at 307, 367, 390-394.  On November 10, 2017, he returned to the emergency room with similar symptoms, and while under hospital supervision suffered two generalized tonic-clonic seizures.  Id.  He received an MRI, following which he was diagnosed with posterior reversible encephalopathy syndrome (PRES), possibly related to alcohol withdrawal syndrome.  Id. at 307, 366-367.

After the seizures, he reported that his left arm was "much weaker and clumsy."  Id. at 361.  Post-seizure examination revealed that he retained fine motor function and a strong grip, but that the strength of his left upper arm was reduced to "3/5."  Id.  On November 16, 2017, when he returned to the emergency room reporting continuing headaches, examination indicated that he had equal grip strength in both hands and full strength in both arms.  Id. at 282.

13

Shaw returned once again to physical therapy on November 20, 2017, complaining of "minimal to no use of his left arm" and specifically advising his therapists that this symptom had started on November 6, 2017.  Id. at 810-822.  Shaw once again began attending physical therapy sessions approximately weekly, and his therapists again recorded steady progress ("weekly improvements") in his recovery.  Id. at 810-892.  By his final session on July 30, 2018, he presented with full range of motion in his left arm and shoulder, and significant progress toward return to baseline strength.  Id. at 887-892.  However, he still had significant weakness in some muscle groups, and his therapists judged that his goal of independence in performing household care tasks and in dressing himself was only partly achieved.  Id.  His therapists opined that his progress had not been either as rapid or as complete as would have been expected in "patients with similar complexities and comorbidities."  Id. at 892.  Shaw was discharged from physical therapy on the recorded ground that he had stopped making appointments.  Id.

Shaw underwent an additional MRI study on January 13, 2018. Id. at 1006, 1010.  That study indicated "prominent resolution" of the PRES condition "but with some minor flair changes still present."  Id. at 1006.  A follow-up MRI on February 7, 2019, indicated that the previously noted abnormalities were "essentially resolved."  Id. at 1010.

14

At the February 13, 2019, hearing before the ALJ, Shaw testified that he was able use his left arm to feed himself, to perform "smaller chores, like a load of laundry, [or washing] dishes by hand," and to "write for a limited period of time," apparently around ten minutes.  Id. at 48-49, 55.  However, he indicated that he could not lift heavy items or carry loads with his left arm, but rather needed to use his (non-dominant) right arm to do so.  Id. at 49.  He stated that he had recently taken up crocheting, but that he could only crochet for a few rows at a time before he needed to rest.  Id. at 49-50.  He stated that he served as a secondary caregiver to his brother, who needed assistance remembering things due to a traumatic brain injury. Id. at 58.  He testified that he was able to use his right arm to perform light gardening tasks.  Id.

Contrary to the contemporaneous clinical findings recorded by the emergency room physicians (discussed above), Shaw testified that immediately after his seizures his left arm had been entirely paralyzed.  Id. at 53-54.  He testified that it had only been after a lengthy period of time that he began to regain mobility in his left arm, at which point he began experiencing pain symptoms in his left shoulder and neck.  Id. at 54.  Shaw further testified that, since his seizures, he had experienced frequent confusion and short-term memory loss.  Id. at 54-55.

15

II.   <u>Medical Opinions Relating to Shaw's Physical RFC</u>

    A.   <u>Treating Physician Assistant Starling</u>

Shaw began consulting with treating physician assistant Starling in March 2016, in connection with conditions not at issue in this action.  <u>Id.</u> at 963, 650-666.  After Shaw's PRES diagnosis, Starling continued treating him for those prior conditions and, in addition, for his reported upper left arm weakness.  <u>Id.</u>  Shaw consulted with Starling every few months during the period between his November 2017 PRES diagnosis and November 29, 2018 (the date of the latest treatment note appearing in the record).

On November 15, 2017—the date of Shaw's first consultation with Starling following his PRES diagnosis—she recorded that he presented with "limited ambulation," "irregular gait," and significant weakness in his left arm (rated at "maybe 2/5"). <u>Id.</u> at 452.  In connection with all of their subsequent consultations, however, Starling consistently noted that Shaw "ambulat[ed] normally" without recording any further observation regarding his gait.  <u>Id.</u> at 436, 439, 442, 445, 448, 650, 658, 661, 988, 991.  Beginning May 9, 2018, Starling consistently recorded that Shaw was getting regular moderate exercise through physical therapy and walking two miles daily.  <u>Id.</u> at 433, 653,

656, 660, 986, 990.  Starling's treatment notes do not otherwise reference Shaw's capacity to stand, sit, or walk.

On May 9, 2018, Starling observed that Shaw presented with "normal" muscle tone and motor strength, and opined that his limb weakness was likely secondary to spinal stenosis rather than to PRES.  Id. at 436.  Starling nevertheless continued discussing Shaw's symptoms of muscle weakness with him over subsequent consultations, without recording the details or content of those discussions.  Id. at 649, 652, 655, 659.  In connection with their final consultation on November 29, 2018, Starling recorded that Shaw presented with full strength and no sensory deficits.  Id. at 1007-1009.

On January 10, 2019, Starling filled out a form provided to her by Shaw's counsel.[4]  Id. at 963-967, 980-984.  On that form, Starling indicated her opinion that Shaw could stand for two hours at a time before needing to sit down or walk, could stand or walk for about four hours total during an 8-hour working day, and would need approximately six ten-minute breaks to walk around during a workday.  Id. at 965.  She indicated that Shaw would need a job that permitted shifting at will between

---

[4] The ALJ found Starling's January 10, 2019, medical opinion unpersuasive on both supportability and consistency grounds. Shaw now challenges the ALJ's evaluation of Starling's opinion.

standing, walking, and sitting, as well as unscheduled breaks at
least hourly.  Id.  She further opined that Shaw could
occasionally lift and carry ten pounds, rarely twenty pounds,
and never fifty pounds.  Id. at 983.  She opined that Shaw was
limited in his left (dominant) arm to gripping and twisting for
50% of a workday, to fine manipulation with his fingers for 50%
of a workday, and to reaching for 25% of a workday.  Id.  She
opined that he had no such limitations in his right arm.  Id.


     B.   Examining Neurologist Dr. Rai

On January 25, 2019, examining neurologist Dr. Rai
conducted a neurological examination of Shaw.  Id. at 1006-1009.
This was her sole contact with him as a patient.  Id. at 975.
She found that he presented as alert and oriented, with
"[n]ormal bulk and muscle tone throughout."  Id. at 1007.  After
examination, she opined that Shaw's prognosis was "Good-Fair."
Id. at 975.  She recommended that he consider coming off
medications in the event a subsequent MRI showed his PRES
condition to be resolved, id. at 1007, as the follow-up MRI of
February 7, 2019 (discussed above), did in fact indicate, id. at
1010.

That same day, Dr. Rai filled out the same form as P.A.
Starling, likewise provided to her by Shaw's counsel.[5]  Id. at
975-979.  Unlike Starling, Dr. Rai opined that Shaw would not
require breaks to walk around during an 8-hour working day, and
would not need to shift at will between standing, walking and
sitting.  Id. at 977.  Dr. Rai offered no opinion that Shaw had
any limitations in his capacity to stand, walk, or sit.  Id.

Dr. Rai opined to still greater limitations in Shaw's
ability to lift and carry than Starling did, indicating that
Shaw could only rarely lift ten pounds and should never lift or
carry weight of 20 pounds or more.  Id. at 978.  Dr. Rai further
opined that Shaw could only rarely look up or down or turn his
head, and that he could never hold his head still.  Id.  Dr. Rai
opined that it was "unclear" whether Shaw had any limitation in
the percentage of a workday he could spend using his arms.  Id.

C.   Reviewing Consultative Physician Dr. Green

On July 17, 2018, consultative physician Dr. Green prepared
a report based on her review of Shaw's medical record.[6]  Id. at

---

[5] The ALJ found Dr. Rai's January 25, 2019, medical opinion
unpersuasive on both supportability and consistency grounds.
Shaw now challenges the ALJ's evaluation of Dr. Rai's opinion.

[6] The ALJ found Dr. Green's July 17, 2018, medical opinion
persuasive on both supportability and consistency grounds.  Shaw
now challenges the ALJ's evaluation of Dr. Green's opinion.

87-102.  On the basis of her review, Dr. Green offered an assessment of Shaw's physical RFC specifically with regard to his expected prognosis as of November 5, 2018, 12 months after the onset of Shaw's symptoms.  Id. at 97.

In the course of discussing and summarizing the entire longitudinal medical record, Dr. Green expressly opined that Starling's assessment of Shaw's capacities was inconsistent with her own clinical findings, in particular the results of her May 9, 2018, examination.  Id. at 93.  As noted, on May 9, 2018, Starling opined that Shaw had normal muscle tone and motor strength, and suggested that his physical examination on that date was otherwise unremarkable.  Id. at 93.

Differing from both Starling and Dr. Rai, Dr. Green opined that Shaw could frequently lift or carry ten pounds and occasionally lift or carry twenty pounds.  Id. at 97.  She further opined that Shaw could stand or walk, with ordinary opportunities for breaks, for more than six hours of an eight-hour workday.  Id.  She also opined that Shaw was limited in his ability to reach with his left arm, but was unlimited in his ability to perform fine manipulation or to handle objects.  Id. at 97-98.

D.    The ALJ's Evaluation of the Opinions of Drs. Green and
      Rai and of Starling

As noted, the ALJ found that Dr. Green's opinion was
supported by citations to relevant medical evidence and
consistent with the longitudinal evidence of record.[7]  Id. at 23.
The ALJ noted that Dr. Green's assessment was as to Shaw's
expected capacity as of a date twelve months after the alleged
disability onset date of November 6, 2017.  Id.  The ALJ noted
that Dr. Green supported her opinion with citations to medical
evidence, including the MRI evidence tending to indicate that
Shaw's PRES had resolved.  Id.  In addition, the ALJ noted that
the medical evidence viewed as a whole tended to show fewer
deficits over time following the initial onset of symptoms.  Id.
The ALJ further noted that the record established that Shaw
gradually ceased seeking medical care toward the end of the
twelve-month period.  Id.  Such evidence included the reported
progress Shaw made in physical therapy and his failure to
continue scheduling physical therapy appointments, id. at 810-
892, and the improvements in his MRI findings over time, id. at
307, 366-367, 1006, 1010.  The ALJ concluded on supportability

---

[7] Despite finding Dr. Green's opinion persuasive overall, as
noted the ALJ found that Shaw had greater limitations in his
physical RFC than did Dr. Green.  Id. at 15, 23.  The ALJ found
these greater limitations on the basis of Shaw's testimony
regarding his symptoms and of his primary treatment provider's
opinion that his left-arm weakness still persisted as of July
2018.  Id. at 23.

and consistency grounds that Dr. Green's opinion was persuasive.
Id.

The ALJ found Starling's and Dr. Rai's opinions less
persuasive.  Id. at 23-25.  As to P.A. Starling, the ALJ
evaluated her opinion as unpersuasive on both supportability and
consistency grounds.  The ALJ found no indication of clinical
findings anywhere in the record to support Starling's opinion as
to limitations on Shaw's capacity to stand or walk, as to which
no other medical source offered a comparable opinion.  Id. at
23-24.  Indeed, the ALJ noted that the limitations on Shaw's
ability to stand or walk were inconsistent with her own
treatment notes that he ambulated normally without indication of
abnormal gait (other than immediately following his seizures).
Id. at 24.  He also found that her opinion as to significant
limitations in Shaw's ability to manipulate objects and to
exhibit fine motor control was inconsistent with her own
clinical findings recorded after her last consultation with him.
Id.  At that time (as noted), Starling found that Shaw presented
at full strength and without sensory deficits.  Id. at 1007-
1009.

The ALJ also found Starling's opinion to be inconsistent
with Shaw's own self-reports of his daily activities.  Id. at
24.  The ALJ noted Shaw's testimony that he was able to lift and
carry small loads of firewood with his right arm, id. at 49,

which he found inconsistent with the opinion that he could only
rarely lift twenty pounds, id. at 24.

As to Dr. Rai, the ALJ likewise found her opinion
unpersuasive on both supportability and consistency grounds.
Id. at 24-25.  The ALJ noted that the deficits described in Dr.
Rai's form opinion are not supported by corresponding clinical
findings in her neurological examination report, including in
particular her opinions as to the degree of weakness in Shaw's
left arm and his near inability to move his neck.  Id. at 24.
In addition, the ALJ found Dr. Rai's opinion to be inconsistent
with Shaw's reported activities of daily living, for the same
reasons discussed above in connection with Starling's opinion.
Id. at 24-25.

Some of the evidence cited by the ALJ in support of her
evaluation of the relative persuasiveness of the opinions is
arguably equivocal, including perhaps in particular the ALJ's
characterization of Shaw's improvement in physical therapy.
However, the ALJ applied the proper legal standards in
evaluating the persuasiveness of the opinions and cited to
substantial evidence in support of her findings.  As noted, the
role of the court on judicial review is strictly "limited to
determining whether the ALJ deployed the proper legal standards
and found facts upon the proper quantum of evidence."  Nguyen,
172 F.3d at 35.  To the extent there are conflicts in the

evidence, it is for the ALJ, and not for the court, to resolve them.  See Irlanda Ortiz v. Sec'y of Health & Human Servs., 955 F.2d 765, 769 (1st Cir. 1991).  Because a reasonable mind could, on the evidence discussed by the ALJ, find that Dr. Green's opinion was better supported by citations to objective medical evidence and more consistent with the medical record as a whole than the opinions of Starling and Dr. Rai, no grounds exist for the court to disturb the Commissioner's final decision.  See Purdy, 887 F.3d at 13.

III.  Medical Opinions Relating to Shaw's Mental RFC

    A.    Consultative Psychologist Dr. Griffin

    On June 27, 2018, Shaw was examined by consultative psychologist Dr. Griffin.  Admin. Rec. at 506-511.  Shaw arrived unaccompanied and on time for the examination.  Id. at 506.  Dr. Griffin found Shaw cooperative with the assessment process.  Id. at 508.  On July 10, 2018, Dr. Griffin prepared an evaluation report on the basis of her examination.[8]  Id. at 506-511.

    In her report, Dr. Griffin noted Shaw's self-reported symptoms of confusion and short-term memory problems since receiving his PRES diagnosis.  Id. at 507.  She further noted

---

    [8] The ALJ found Dr. Griffin's July 10, 2018, medical opinion unpersuasive on both supportability and consistency grounds. Shaw now challenges the ALJ's evaluation of Dr. Griffin's opinion.

his description of struggles with depression and post-traumatic stress disorder for which he had never sought therapy and which he characterized as "in check" at the time of examination.  Id. at 508.

Dr. Griffin assessed Shaw's thought processes as "generally logical and goal-directed," his verbal intellectual functioning in the normal range, and his nonverbal intellectual functioning as marginally within the normal range but borderline impaired. Id. at 508-509.  She found that his areas of cognitive weakness involved measures of "auditory attention/working memory and visuospatial reasoning," and opined that his performance in these areas was "significantly below expectations" based on his performance in other areas.  Id. at 509.

Dr. Griffin further opined that Shaw was "generally capable of understanding and remembering verbal material (i.e., spoken and written instructions) but does not appear capable of understanding and remembering visual/nonverbal material consistently."  Id. at 510.  She opined that "this may have an adverse impact upon his ability to learn and remember information that is visual in nature."  Id.

Dr. Griffin additionally indicated her opinion that Shaw "d[id] not appear capable of consistently attending to work-related tasks at th[e] time [of examination]," although she stated that he appeared "capable of adequate processing speed"

for purposes of the tasks he performed in connection with her assessment.  Id. at 511.

Dr. Griffin found that Shaw was "polite and cooperative" throughout the evaluation.  Id. at 510.  She expressly opined that he would be "able to relate to/work with individuals in a work setting without significant difficulty."  Id.

Dr. Griffin stated that prognosis as to the length of treatment Shaw would require was "unclear at th[e] time [of examination]."  Id.  She stated that her evaluation of his cognitive symptoms had been "very limited" and that his symptoms should be "monitored over time."  Id.

### B.   Treating Social Worker Wizmer

Shaw began consulting with Wizwer, a social worker and an associate of P.A. Starling, in July 2018.  Id. at 721.  She saw Shaw weekly thereafter, through at least early January 2019.  Id.

On January 3, 2019, Wizwer filled out a form provided to her by Shaw's counsel in this action.[9]  Id. at 721-726.  Through her entries on the form, Wizwer described the clinical findings that demonstrated the severity of Shaw's mental impairments as

---

[9] The ALJ found Wizwer's January 3, 2019, medical opinion unpersuasive on both supportability and consistency grounds. Shaw now challenges the ALJ's evaluation of Dr. Griffin's opinion.

"ruminating thoughts, anxiety, sleep distur[b]ance, and nightmares." Id. at 721.  She offered her opinion that Shaw had extreme limitations in concentration, persistence, and pace, marked limitations in his ability to understand, remember, or apply information and his ability to interact with others, and moderate limitations in his ability to adapt or manage himself. Id. at 723.  In stark contrast with Dr. Griffin's assessment of Shaw's social skills, Wizmer opined that he had extreme limitations in his ability to travel in unfamiliar places, marked limitations in his ability to interact appropriately with the general public and to use public transportation, and moderate limitations in his ability to maintain socially appropriate behavior.  Id.

Wizmer further opined that Shaw had extreme limitations in his ability to understand and remember detailed instructions, marked limitations in his ability to carry out detailed instructions, and moderate limitations in his ability to make independent plans and to deal with the stress of semiskilled or skilled work.  Id. at 724.  She opined that Shaw was likely to be absent from work approximately four days per month due to his impairments and/or need for treatment.  Id. at 725.

Wizmer expressly opined that Shaw's symptoms had been present since November 6, 2017.  Id.

C.   <u>Consultative Psychiatrist Dr. Kleinman</u>

On July 12, 2018, consultative psychiatrist Dr. Kleinman prepared a report based on his review of Shaw's medical record.[10] <u>Id.</u> at 87-102.  Dr. Kleinman offered an assessment of Shaw's mental RFC specifically with regard to his expected prognosis as of November 5, 2018, 12 months after the onset of Shaw's symptoms.  <u>Id.</u> at 98.

Dr. Kleinman noted the results of Dr. Griffin's consultative examination, and observed that the record contained indications that Shaw was "continuing to improve as expected" from PRES.  <u>Id.</u> at 96.  He broadly agreed with Dr. Griffin that the medical evidence established that Shaw had limitations in understanding and memory, but disagreed with Dr. Griffin as to the severity of those limitations.  <u>Id.</u> at 98.  Specifically, he opined that Shaw had marked limitations in his ability to understand and remember detailed instructions, and moderate limitations in his ability to understand and remember short, simple instructions.  <u>Id.</u> at 99.  In addition, he opined that Shaw had only moderate limitations in concentration, persistence, and pace, no social interaction limitations, and no adaptation limitations.  <u>Id.</u>

---

[10] The ALJ found Dr. Kleinman's July 12, 2018, medical opinion persuasive on both supportability and consistency grounds.  Shaw now challenges the ALJ's evaluation of Dr. Kleinman's opinion.

D.   The ALJ's Evaluation of the Opinions of Drs. Kleinman
     and Griffin and of Wizmer

As noted, the ALJ found that Dr. Kleinman's opinion was
well supported by citations to relevant medical evidence and
consistent with the longitudinal evidence of record.[11]  Id. at
23.  The ALJ noted that Dr. Kleinman's assessment was of Shaw's
expected capacity as of a date twelve months after his alleged
disability onset date of November 6, 2017, and therefore took
into account expected improvement in Shaw's cognitive capacities
as he continued to recover from the effects of PRES.  Id.  The
ALJ noted that Dr. Kleinman supported his opinion with citations
to medical evidence, including evidence of unremarkable mental
status examinations.  Id.  In addition, the ALJ stated that Dr.
Kleinman's opinion was consistent with the absence of any
clinical findings of record regarding significant cognitive or
memory defects.  Id.

The ALJ found Dr. Griffin's opinion less persuasive,
although, as noted, she incorporated portions of Dr. Griffin's
opinion into her assessment of Shaw's mental RFC.  Id. at 25.

---

[11] Despite finding Dr. Kleinman's opinion persuasive
overall, the ALJ found more persuasive some of Dr. Griffin's
findings not incorporated into Dr. Kleinman's opinion, id.,
specifically her findings regarding Shaw's limitations in his
ability to understand spoken instructions, id. at 510.  As
noted, the ALJ included those limitations in her assessment of
Shaw's mental RFC.  Id. at 15.

However, she found Dr. Griffin's opinion as to the severity of Shaw's memory and verbal comprehension deficits to be inconsistent with Shaw's score within the normal range on the mini-mental status examination that Dr. Griffin herself administered, id. at 508.  Id. at 25.  She also found that same portion of Dr. Griffin's opinion to be inconsistent with Shaw's self-reported abilities to act as a secondary care-giver to his brother and to garden.  Id.  In addition, she found Dr. Griffin's opinion as to Shaw's limitations in concentration, persistence, and pace to be inconsistent with Shaw's self-reported ability to crochet.  Id.

As to Wizmer, the ALJ found her opinion to be simply unpersuasive.  Id.  The ALJ noted that Wizmer's opinion did not include express references to supporting medical evidence.  Id. Indeed, the ALJ found that Wizmer's opinion was internally inconsistent, in that Wizmer opined that Shaw's symptoms had been present some eight months before Shaw began consulting with her.  Id. at 25-26.

In addition, the ALJ found Wizmer's opinion to be inconsistent with other evidence of record.  Id.  In particular, the ALJ found that Wizmer's opinion as to limitations in Shaw's ability to conduct himself socio-emotionally were entirely inconsistent with the findings of all other medical sources of record, with all relevant clinical findings in the record, with

30

Shaw's reports to his caregivers, and with his reported daily activities.  Id.  The ALJ found that Wizmer's opinion regarding limitations in Shaw's concentration, persistence, and pace and in his ability to adapt and manage himself was inconsistent with Shaw's self-reported activities and with his performance on mental status examinations of record.  Id. at 26.

Again, some of the evidence cited by the ALJ in support of her evaluation of the relative persuasiveness of the opinions is arguably equivocal.  Nevertheless, it is clear that the ALJ applied the proper legal standards to evaluating the persuasiveness of the opinions and cited to substantial evidence in support of her findings.  Because a reasonable mind could, on the evidence discussed by the ALJ, find that Dr. Kleinman's opinion was better supported by citations to objective medical evidence and more consistent with the medical record as a whole than the opinions of Dr. Griffin and Wizmer, no grounds exist for the court to disturb the Commissioner's final decision.  See Purdy, 887 F.3d at 13.

**CONCLUSION**

For the foregoing reasons, Shaw's motion to reverse (doc. no. 7) is denied, and the Commissioner's motion to affirm (doc.

no. 9) is granted.  The clerk of the court shall enter judgment

in accordance with this order and close the case.

SO ORDERED.

_____
Landya McCafferty
United States District Judge

June 10, 2020

cc:  Counsel of Record